This case is number 161492, Mark W. Eves v. Paul R. LePage Counsel, you may proceed. May it please the Court, and good morning. I'm David Weber. I'm here with my co-counsel, Carol Garvin. With permission of the Court, I reserve three minutes for rebuttal. May I ask you to excuse my cold? I'm sorry about that. Just keep your distance. That's probably a good policy for me in general, right? Not to be too close to you all. On June 5th of last year, the defendant learned for the first time that the plaintiff had just been hired as the president of Goodwill Hinckley, which was a 100-year-old organization, private, nonpartisan, nonprofit, dedicated to helping at-risk youth. The defendant happened to be the leading member of one party in the state, and the plaintiff happened to be the leading member of the other party. Four days later, on June 9th, the defendant caused a stop order to be issued, withdrawing and pulling back $132,500 that was already authorized to be delivered to Goodwill Hinckley in about three weeks. Had that money been appropriated at that point, or was it the authorization in anticipation of an appropriation? It was not in controversy, that particular part of the budget. Answer my question. The budget was not yet law, but everyone was acting as if that was definitely going to be in it. So at the point when this happened, the withdrawal of the funds or the sequestration of the funds by the governor, the funds had actually not been appropriated. It was still in the main legislature, the general appropriation. As you say, perhaps it wasn't controversial, but one doesn't know about controversy until you in fact pass the budget. Isn't that true? Well, the facts are that the executive branch felt so confident that that was going to be authorized that they went ahead and the Department of Education authorized the payment. So the reality of the world, the facts, I'm not speculating about this, the Department of Education issued the payment. They were so confident that that was going to be in the budget. So in the real world, the money had already been sent from the Department of Education. So in the real world, the facts and the complaint, I'm not speculating about that. Let me just follow up on what Judge Stahl has been asking you about. It hadn't yet been authorized, but on the other hand, the check wasn't due at the school until after July 1. Is that correct? It was a quarterly payment that would be due on July 1. Okay, and in the end, after your clients complied with the governor's wishes, they did get the payment. Oh, yes, they got the payment right on time because they did the one thing they were told they had to do to get that money, which was to fire my client. You know, we are very familiar with the facts in this case. Don't spend a lot of your time arguing that. I think the hardest issue is the qualified immunity issue, especially the two prongs of the second prong. That is, was there a clearly established right that was violated and could any reasonable governor on the facts of these cases think that what he was doing did not violate Mr. Eve's constitutional rights? Well, let me move to that issue. Please. First, noting that the claims for declaratory injunctive relief are in no way limited by your decision on qualified immunity, and they're very important claims in this case. We will come back to that. We have a lot of questions. So political affiliation, fortunately, for the court and for the plaintiff, has been well ventilated in the Supreme Court and in this court, and so there's lots of clearly established case law, and it's unusually simple. The Supreme Court has said this area is simpler than some other areas of the First Amendment because political affiliation is something we really just don't want to have considered unless, and the only real issue here is there's an exception, which the Supreme Court in this court has said don't call it policymaker. That's really a misnomer. It is, is it a reasonable requirement of the job to have party loyalty to be effective in the job? And every case cited, and it's an exception, Your Honor, so the Supreme Court just this year said there are few exceptions to this rule. So for qualified immunity purposes, I just want to point out the defendant is relying solely on an exception, first of all. And so the law, it's clear that there was knowledge, timing, and causation. So we're down to an exception that the Supreme Court has said is narrow and circumscribed, and that's the only question. And they cite no cases where a employee in the private sector working for a nonpartisan private organization, that any court would ever say that partisanship or party loyalty, I mean, every hospital in Maine, every social service provider will have to change, not just the president, but their entire leadership team, every time we have a change in party. No reasonable governor, and the district court has so found, could think that the president of a 100-year-old nonprofit, nonpartisan social service provider should have party loyalty. And so that is the issue, and the district court correctly found that that would not be reasonable. And so there is no qualified immunity. And that area of law really is well established, and that is the standard. And the only case they cite that even involves the private sector at all is Prismazona, which did not involve a plaintiff who was fired from a private sector job. It involved an actual organization. But when you look two seconds underneath the covers, the First Circuit had a thing and found out that was conceived in partisanship. The board of directors, the whole thing was a political construct from day one to implement a party scheme. And so this quote, you know, common sense said, if it's conceived in partisanship, if it's about partisanship, that obviously is fair, it's good for the goose, it's good for the gander. And if it's conceived in partisanship, it can be ended in partisanship. Goodwill-Hinkley was created in 1889. It has a nonpartisan board of directors. There is no precedent of saying that you can think that just because social service providers or hospitals or private universities accept some government funding, that that means the governor of that state can fire or force the firing because they don't have loyalty to his party. The consequences of that are so extreme. So there's no case law to support that application of the exception. The rule is clear. So that's why qualified immunity does not apply to the political affiliation claim. On appeal, just to simplify things, hopefully that was helpful, we had damage claims for all five counts. And life is short, and you've got to pick your battles. So for overlapping claims, if I win one, I'm not going to get a windfall or extra damage on the other. I limited the damage claims to three of my five counts. I don't think that's virtually abandonment. So I really want to clarify, that's three. But it is the political affiliation claim and the political association claim, which really goes along quite a bit with the political affiliation claim. But Garcetti, I just think, has gotten confused by a couple courts, and so I dropped the damages claim on the free speech claim and on the procedural due process claim. So political affiliation is really, it's got that one exception. That's the only issue. And on that exception, there is no factual basis. And just to explain further, I know the facts, the court knows them, but they relate to this qualified immunity question. Goodwill-Hinckley, the plaintiff was selected as president of Goodwill-Hinckley, not the charter school. The charter school has its own board of directors, separate from the board of directors of Goodwill-Hinckley, and its own principal. And the million dollars was not going to the charter school. It was going to Goodwill-Hinckley. So the charter school is a red herring in that sense, because he was not selected as the president of the charter school. In any event, Goodwill-Hinckley, which he was elected president of, is a private, nonpartisan organization, and there is no bargain for making that leadership change hands every time the party changes hands. That would reduce it to a one-party state, because Maine is a small state. The social service providers all depend on state funding. Most organizations depend on state funding indirectly or directly. If that means their leadership has to change every time the party changes of the governor, that's going to reduce us to a second-class democracy. So this issue is really important. But the governor's statements, although you may be correct that the school has its own board, the governor's statements seem to focus in on the charter school issue, which divides a lot of states. And I'm not certain that one can ignore the charter school, which you seem to be inviting us to do. On a motion to dismiss, you should, Your Honor, because we're not deciding. No, on a motion to dismiss, you have pled that he has said this is related to charter schools. That's because it's evidence of pretext. Because if I alleged that he said the plaintiff was not qualified, I would put that in not because I believed it, but because there's other evidence undercutting that to show pretext. So in this case, the prior president of Goodwill-Hinkley, who the governor said did a fine job, was an opponent of charter schools. So the reason the governor came up with an excuse is he didn't want to say, I want to fire my political opponent. But pretext is, I pled that because it strengthens my case. The court shouldn't take sides with that yet. That's for discovery and a trial as to whether he said that because he meant it or because he was looking for any excuse to inflict maximum punishment on the Democratic Party and send a message, if you disagree with me, I can take down the Speaker of the House. Could you spare a lot less than two minutes? Could you spend some time on injunctive relief? First, is your client now employed? Yes, he is. And there is no claim that the governor continued in his efforts to prevent your client from being employed anywhere? Well, yes, he never withdrew the threat against Goodwill-Hinkley, and the position remained open for quite a while. So my client would now be employed there, and the chairman of the board said he wouldn't be the president but for the threat for the governor. So the continuing effects on my client, they're pretty overriding in the sense of the First Amendment. So he works in the social service provider area because his career is in that area. He's dedicated his life. So that means every day a person who shoots has to think, do I want to disagree with the governor and subject my employer to possible injury given the severity and the intensity of the governor's retaliatory pattern. But the fact that he is, in fact, employed in that very field, doesn't that indicate that there is no ongoing threat to his ability to be employed in the very field? I don't want to take a pay cut. And I don't want to work at a job where I talk to the other social service provider and I work with them and they say, we'd love to work with you when the next governor comes in. So, no, I don't think it's all or nothing. A job is not just a job. Jobs have economic value, which is diminished because economic value is diminished because of this huge threat from the person who has the most financial power. I think you were here for the last argument. I'm sorry? You were here for the last argument, the diminishment of economic opportunity. Yes, I exactly agree with that. The court already explained my argument better than I have. But more importantly, the First Amendment. Every day you have to think, do I want to speak out? And is he picking his fights more? And leaving a person under that, that is an ongoing chilling. Do I want to vote for governor? I just have one quick question. Do I want to vote for governor? In the legislative process, in any legislative process, when you're arguing about a budget, ultimately the budget gets passed. I gather one got passed in Maine, which contained the kinds of programs which your client would have supported. And the governor, I understand, vetoed it. And the veto got overridden so that there is a political process, which doesn't solve these problems. No, Your Honor, because in Maine you get $24,000 for two years in the legislature. My client has three children. You cannot make a living. So if you have to decide every time, do I oppose? Do I vote this way? Do I take this position? Or I might not be able to provide for my family. And the Republican leader, they all said this is a chill. I believe Judge Thompson has a core goal at this point. So it's a great chilling that hangs with everybody, including my client, that continues. Thank you. Thank you. Thank you. May it please the Court. Patrick Strawbridge on behalf of the defendant in this case, Governor Paul LePage. I think I'd like to start with a qualified immunity point. I think that Your Honor was very quick to hinge on that as the most difficult part of the case for Mr. Reeves. We absolutely agree. The standard here is not whether or not somebody thinks that some of these activities may have violated some constitutional rights, but whether it was clearly established that they did so. And for two separate reasons which dispose of them. I'm not sure you want to formulate it that way, but would a reasonable governor in these positions have understood that he was violating the constitutional rights of Mr. Reeves? Well, the Supreme Court has said it has to be beyond debate. That's right. It's the second prong of the second prong. Correct. And that's what I think what it takes. Okay. Why should we do this on motion to dismiss rather than summary judgment? Well, for several reasons. The first is that, as we point out, his allegations on their face invoke the government speech doctrine and invoke the policymaker doctrine. However, this court and the Supreme Court has been very clear that immunity has to be decided at the earliest point possible in the case because it is an immunity from suit, not a defense from suit. Obviously, the governor has a lot of responsibilities in the state of Maine, and the court has an obligation to address questions of immunity at the earliest possible stage in the case. So that's why we do it on a motion to dismiss. What do we do with the fact that there's an accusation of pretext here that the linkage to the charter schools can't possibly be true partly because of the predecessors in this position and partly because of your client's position as to all Democrats in the state legislature? So I have a few responses to that. It's a difficult problem with the complaint, I think, with the case, actually, the fact that he has alleged all these other political acts, many of which are, as we argue that this actual act is, are covered by legislative act immunity. And because this was all happening in the middle of a legislative process that, like all legislative processes, is somewhat freewheeling and unwieldy and difficult to predict what the outcome is going to be from hour to hour, if not day to day, that can be difficult. But the allegation of pretext doesn't really, I think, move the deal with respect to any of these cases. One, because, for example, our policymaker argument, it doesn't matter. If he's a policymaker, it's an exemption from the First Amendment retaliation line of cases. So pretext or not, the question is, is he a policymaker? Could the governor reasonably expect that the leader of this institution that operates the state's premier charter school would be hostile to the policies that the governor has and, frankly, the reason why this money was contributed to that school? The second issue is because when it comes to government speech. But why do we have to take that at face value, given the allegations? That's his position, but why doesn't the complaint plead sufficient pretext allegations for further consideration? Well, as Judge Lynch noted, on the face of the complaint, what he's trying to do with the basis for his action, the alleged retaliatory acts are bound up in his speech, and the speech on its face addresses these concerns about charter schools. So you have to look at the allegations regarding speech in order to determine whether government speech is in fact implicated or not. It's in part charter schools, but it's certainly well beyond statements regarding charter schools. The governor's statements about packing up and going back to California, that has nothing to do with charter schools. The allegations about all Democrats, that has nothing to do with charter schools. It's still protected government speech, first of all. It's still irrelevant if the policymaker exception applies, which I want to make a very quick point about the policymaker exception. This court has been absolutely clear in the two cases that we cite, that the policymaker exception does apply to private entities that receive government funding. And moreover, it has explicitly held in the Lopez-Canonis case that the qualified immunity overlay applies to that. So the question is not simply, is he a policymaker, is he not a policymaker? Is it clearly established that this type of law would not fall within that exception? That's really decisive in this case. And in that case, it doesn't matter if he was fired because of his partisan identification or because of his speech. The policymaker exception has to provide some flexibility in important cases of state funding on an issue of obvious public importance. You know, this is a citizen legislature. It's pretty clear that in a citizen legislature, the legislator has to have a way to earn a living in addition to whatever he or she receives as a legislator. Here, the actions of the governor go directly to the private life of that legislator and says to him or her, if you don't follow my bidding, I'm going to make sure that you can't be employed. Isn't that what happened here? No, the complaint falls far short of alleging anything of that sort. The complaint is confined to one particular controversy, one particular job. It quotes the reasons that the governor gave at the time for why he opposed and allegedly opposed future prospective funding. It doesn't say anything about any other attempt to interfere with any other job opportunity, which is why there are no life claims for injunctive relief. As your honor pointed out, he's employed. He's been employed for more than a year. Two months ago, there were public news articles saying that he had been named the executive director at a new job of the social service agency. This court has been very clear in the ACLU. Suppose the governor had said, as to Mr. Eves, I intend to drive him out of the state. I intend to see that he never gets employment. He should go back to California. Is that a different case, which would allow injunctive relief at least? If there had been allegations of that specific, perhaps. I'm not so sure that it would, because this court is very clear in the ACLU case that there needs to be some kind of continuing conduct from the allegations and the complaint to support injunctive relief when claims for damages are no longer on the table. And there is no allegation of continuing conduct. There just simply is not any. He amended this complaint twice after it was filed, including on the eve of the oral argument in the district court, which was some eight or nine months after all the events in question. At no point in time has he ever alleged any other effect with respect to any other job opportunity other than this one. The court has to take the allegations as they're made. What is your view of the effect of the Garcetti case on the claims being made here? The Garcetti, well, to be clear, we think that the due process claim has been waived at this point in time. Yeah, fine. And I know it's no longer characterized as a speech case, but nonetheless there are speech elements involved here. Well, to be clear, as Judge Stahl, I think, noted in the first time around, we don't think that there is any alleged action or retaliatory act other than speech because of the reality that the alleged stopped payment or it was a question of DOE sending a request to the comptroller to issue a check that would eventually go out on July 1st. All of that related to proposed unappropriated funds, which simply we don't think that the failure to issue funds that had not yet been appropriated can serve as a basis for a retaliatory act. So we do think it is all speech. Forgive me, I may have not actually gotten around to your question. We've talked about why you think this is government speech. It's the governor of a state articulating his administration's view on how state funding, which is likely to be appropriated, should or should not be used. The other side of it is Garcetti involves cutting back on the ability of a plaintiff to make a First Amendment claim when the subject matter of what he's been doing is his job. That an employer may, and not that the governor was his employer, but an employer may give less protection under the First Amendment to a person in such a position. We cite the discussion of the Wertheiser case from the Third Circuit, which we think is the best survey of the case law, and we explain why we think that the application of Garcetti to an elected official is an appropriate rule because Garcetti is really, in the First Amendment retaliation context generally, is concerned about the government's scrutiny and punishing people for things that are completely unrelated to any governmental interest. It's just private speech. And of course, the speaker's conduct and the speaker's actions with respect to charter schools and whatever other speech that is the basis for a retaliation claim is made pursuant to his public duties. But as the district court noted... You're kidding me. Excuse me? It was pursuant to his public duties that the governor calls up these people and makes these comments? No, no. I think we're talking about... Excuse me. I apologize. I think we're talking about two different things. In Garcetti, the question is, can the governor retaliate against the speaker for the speaker's speech? And our claim under Garcetti is that the speaker's speech cannot serve as the basis for a retaliatory claim because it was made in the speaker's role as an elected public official. That's the difference. I do not, however, concede that the governor does not have an interest in expressing his views to the qualifications of Mr. Eves to lead this charter school. I don't think that there's any controversy about the fact that the governor would have an interest in expressing his opinion and absolutely advancing his policy in the public realm and with all relevant stakeholders about what's going to happen to this charter school and whether they have made an appropriate change for leadership. Just as it would be no different, for example, if a contractor who was hired to provide family planning services hired a devoutly religious anti-abortion or anti-contraceptive person to become their president, the state and state officials would absolutely be justified in questioning whether or not funding for that organization should continue to flow, especially discretionary future funding. Just as if somebody hired a prison company to operate a state prison and it was found that they had made racially insensitive remarks. The legislature and the governor and the elected officials need to be free to express their opinion and to use the legislative process to implement their policies. As I think Judge Stahl noted the first time around, it's important to remember that there are a lot of alternative remedies to bringing a constitutional lawsuit and indeed constitutionalizing everyday give-and-take threats, cajoling promises that are made as part of the legislative process. In this case, it was the subject of extensive press coverage in Maine, as you may well be aware. It was the subject of extensive hearings in the House of Representatives and an impeachment motion that ultimately was catered. It was referred to the Attorney General, who was of the opposite party to the governor, for criminal investigation. No action was ultimately taken. There are many political remedies for this type of a political dispute, but a federal lawsuit on these facts does not lie. And as you noted, the problem is, and we're still waiting for it, no one has identified a government speech case that found a sufficiently actionable coercive threat under anything close to these kinds of facts involving elected officials, involving pressure to a third party, and involving proposed funding that had yet to be appropriated and ultimately was subject to a veto. Just to satisfy me, when the money was ultimately released, had the budget been approved and signed and enacted into law or was it released before that actually happened? No, the money was not actually sent to the school until the budget had been enacted and appropriated. And in fact, as part of this process, the state has reformed its check issuance policies and it makes sure that there are no check requests that go in for any unappropriated funds with respect to this program or others. Or any other program. Right. But did they used to? No, the allegations in the complaint are not that clear. There's some suggestion that on occasion they would ask for the check to be drawn so it could be issued after the funds, where the complaint stops short of actually arguing that the money was sent to the school before the beginning of the fiscal quarter. Where in that office a drawn-up-on-check is floating around in the state, I don't think really makes a difference in this case. The funds were unappropriated and there's no allegation that the school received the funds before the beginning of the fiscal year. And we obviously can't have retaliation claims based on internal check processing for funds that have not been appropriated. But given your posture in the case, this fact that this is before the budget is passed doesn't really matter. Even if the legislature had appropriated these monies, say all of this takes place a month later, you would still be making the same arguments to us. We would be making many of the same arguments. The analysis of those arguments may alter slightly. The absolute immunity argument, I think, for example, changes slightly after the affiliation, although the discretionary nature of these funds, we think, makes a distinction without a difference. But it would be a distinction. But the discretionary nature of the funds, our LDA case, which is about a governor angry with the press, and so he cancels all the state contracts with the press, trying to deprive them of money. We said there that even discretionary acts are within the reach of a First Amendment claim against the governor. But that's not a good dividing line. If I may just address that question. My time is about to expire. Go ahead. And it's important because LDA made its very first appearance in this case in their reply brief. LDA, which is a newspaper case, can be distinguished in a number of different ways. First of all, on its face, LDA specifically reserved the fact that the result in that case would be different if the complaint had made clear that it was an act of government speech. The complaint on its face did not implicate the government speech doctrine. Secondly, some discretionary acts, for example, may still be subject to it. But when the legislature has basically left the discretion to appropriate, then that appropriation remains a legislative act. And that's the difference. Okay, thank you. At least six other circuits have found that the line between attempting to convince and the line to attempting to coerce were met by mere threats. And this court has said, that's the line. And they're trying to move that line on you. And those other cases are much less significant threats than I'm going to take a million dollars away from you and it's going to destroy your organization. That threat is so strong compared to the other six circuits that I don't understand this. That's because the Supreme Court, a lot of that law is before Summa. Is that the first government speech case? A lot of it's before Garcetti is decided. And it's not so clear to me that our prior precedence in this area, much less. Let me point you to Judge Posner who wrote a great opinion last December following the Malinari Second Circuit case that Justice Sotomayor was on the panel. And Judge Posner. You're dropping the right names. That was one of my favorite names. And Judge Posner said, it is that line. And that case was a weaker case. There was no million dollar threat. And he said, it goes from an attempt to convince to an attempt to coerce. And he reversed the denial of a preliminary injunction, a unanimous ruling. So in this case, the defendant keeps mixing up the facts that we were calling an adverse action and the facts were not. On June 8th, and I know I didn't get into all the facts, but I think they are important. On June 8th, the defendant wrote a letter that was attempting to convince. It was a public letter and he ripped into the plaintiff. That was free speech. That's government speech. And we have known that is not an adverse action. We have made that clear a hundred times. And the defendant keeps pretending that we are attacking his speech. It's not speech. It's withholding a million dollar of taxpayer funds. And this case is much clearer and simpler than those other Sixth Circuit cases that I've cited, including the back page case of Judge Posner that cites Molinari as from December of this past year. That needs to be, you're fired. Shoot him. It's speech under their logic. Everything that you can do with words is government speech. But he did say, this is my intention to do this. That's a threat, Your Honor. Your case law is very clear. That's the line. As a matter of fact, he quotes twice. This court's case law leaves out the second part of the sentence, which says, except when there's intimations. That's a hint. This is not a hint. This case is so far under that line. Your court has said intimations. Those are hints of a threat. He left that half out of the sentence to you twice. I tell us that's the first part, so it doesn't matter what happens. And your court has 600 circuits that agree with you. It just takes intimation. I'm going to take $1 million, calls up the other funder with the $2 million, knows he's going to put him out of business, says all in my complaint. If that's not enough, this would be a terrible precedent for me. Okay, I have a final question. Your brother said the political processes can take care of this. This is not the business of the federal courts. That's why qualified immunity exists for people in the position of the governor. I respectfully disagree. The Supreme Court decided not to give absolute immunity. Qualified immunity. No, no. I'm talking about qualified. Right, it's only qualified. And what the Supreme Court said, this court said fair notice. That's the only term that this court has used. And so in the context of no debate, it means it's not debatable if there was fair notice. And there was fair notice because the exception for partisanship could not apply. There was no case law that he has anywhere near that. I'm sorry, you're not answering my question. The Supreme Court would not have created political information. Why is it important that the federal courts be a decision-maker here as opposed to the political processes? You're in the third branch. You're very important. For example, just Monday, Judge Posner issued a TRO striking down an executive order of a governor. I thought that that might come up. Congress passed 1983. Impeachment is not the alternative. This court enforces the ground rules of our Constitution. And if the governor is allowed to exceed the ground rules, then that is the tyranny the Supreme Court said 1983 is designed to combat. And federal courts are here to do that. Okay. Thank you very much. Thank you. Good arguments from both sides. Thank you, Your Honor.